THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISON

| | | |
|---|---|---|
| Antwan Rafael Gallmon, Jr. | ) | Case No.: 3:17-cv-00059-TLW-PJG |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **PLAINTIFF'S OBJECTIONS TO** |
| v. | ) | **THE REPORT AND RECOMMENDATION** |
| | ) | **ON DEFENDANTS' MOTIONS FOR** |
| **Robert Cooper, Charles W. Morrison,** | ) | **SUMMARY JUDGMENT** |
| **Forest Acres Police Department and** | ) | |
| **Gene Sealy, Individually and in his** | ) | |
| **Official Capacity as Forest Acres Police** | ) | |
| **Department Chief of Police,** | ) | |
| | ) | |
| **Defendants.** | ) | |

Plaintiff offers the following as objections to the Report and Recommendation of the Honorable Paige J. Gossett dated April 19, 2018. Plaintiff incorporates by reference the arguments made in his previous memorandums (ECF Nos. 43 and 45). Plaintiff specifically objects to the following sections the Report and Recommendation: Background; B. 42 U.S.C.- Excessive Force; and C. 2. Forest Acres Defendants.

1. **The Report and Recommendation ("Report") does not accurately reflect Plaintiff and Officer Cooper's actions immediately before Officer Cooper shot Plaintiff.**

The Report states:

> Officer Cooper took a step to his left, placing himself more directly in front of the Honda. Gallmon raised his right hand and kept his left hand on top of the steering wheel. Gallmon began to move the vehicle forward. . . . While he was shooting, the car began moving

> past Officer Cooper to his left … Officer Cooper stepped to his left, toward the Honda, as he continued firing at Gallmon at close range.

(Report, p. 3 (citations omitted)). The Report states that Officer Cooper was "more directly in front of the Honda" as Plaintiff drove the Honda forward creating the inference that Officer Cooper was in the path of the Honda. Based on this statement of the facts, Her Honor finds Officer Cooper is entitled to qualified immunity because "he could objectively reasonably perceive he was in danger of death or serious bodily harm." (Report, p. 11).

The Report ignores the fact that immediately prior to and at the time Officer Cooper began shooting at Plaintiff, Plaintiff was deliberately steering his Honda away from Officer Cooper. (Exhibit C, 17:57 to 18:09) The dash cam video shows Plaintiff is actively turning the steering wheel to the right immediately before and as he pulls the Honda forward. *Id.* As Plaintiff moves the Honda forward, the vehicle is moving further to the right, and continually taking the path of the Honda further from Officer Cooper's position. *Id.* While Officer Cooper was not in the path of the Honda as it moved forward, he continued to move to his left, apparently in an attempt to move into the path of the Honda. *Id.* At the time Officer Cooper opens fire, despite his very apparent attempt to move into the path of the Honda, he is in fact not in front of the Honda but to the side of the front of the Honda. *Id.* Given that Officer Cooper was in front-side location of the Honda, and the vehicle was moving further from his direction as it rolled forward, Officer Cooper was not and could not be in danger of being hit at the time he opened fire. Further, as he was beside the Honda and it was slowly moving away from him when he opened fire, Officer Cooper could not reasonably perceive he was in danger of death or serious bodily injury at the time he began firing at Plaintiff. As "case law is clear that an 'officer's 'liability [must] be determined *exclusively* upon examination and weighing of information [he] possessed

*immediately prior to and at the very moment [he] fired the [] shot[s],*'" these facts are relevant to this action. (Report, p. 9).

2. **The Report misinterprets *Waterman v. Batton*, 393 F.3d 471 (4th Cir. 2005).**

The Report misinterprets *Waterman v. Batton*, 393 F.3d 471 (4th Cir. 2005) in finding Officer Cooper is entitled to discretionary immunity. *Waterman* involves a § 1983 action against law enforcement officers for violating Waterman's Fourth Amendment rights through the use of deadly force. In *Waterman*, an officer attempted to initiate a traffic stop of Waterman when he observed him traveling 51 mph in a 25 mph zone. Waterman did not stop for the officer's blue lights and siren and a chase ensued. *Id.* at 473. During the chase Waterman tried to run pursuing officers off of the road. Officers also observed Waterman reaching down under his seat. This information was radioed in to dispatch to warn other officers. *Id.* at 474.

The defendant officers gathered at a toll station that Waterman would be forced to use in an attempt to cut him off. The officers placed out stop strips and waited. After a ten minute chase, Waterman emerged from a tunnel and continued towards the toll plaza. Waterman slowed to 11 mph and began to coast as he neared the toll plaza. Officers approached his vehicle with guns drawn. Waterman accelerated his vehicle causing the vehicle to actually dip down and rise back up. *Id.* at 474.

When Waterman accelerated, the defendant officers were ahead of the vehicle at distances of 16 to 72 feet from the vehicle. The officers were not directly in the path of Waterman's vehicle but were all within a few feet of the vehicle's path. Waterman would have closed the distance to the nearest officer within one second. *Id.* at 475.

When Waterman accelerated the defendant officers fired from their positions ahead of Waterman's vehicle. Waterman passed the defendant officers and avoided them by several feet.

The defendant officers "continued to fire their weapons at [Waterman] from the passenger side of the vehicle and from behind." *Id.* at 475. Waterman was shot five times and died as a result of the shooting. *Id.* at 475.

In analyzing Waterman's claim, the Fourth Circuit differentiated between the initial shots fired, shots fired when the vehicle accelerated, and "subsequent shots", the shots fired from the passenger side and rear of Waterman's vehicle. In finding the subsequent shots unconstitutional, the Fourth Circuit held "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." *Id.* at 481. In developing this approach and making the distinction between the initial and subsequent shots, the Court reasoned that when an officer attempts to justify his use of deadly force against the driver of an oncoming vehicle by claiming that he was trying to prevent the vehicle from running someone over, the position of the person relative to the path of the vehicle is important. *Id.* at 479. The court adopted a standard for the use of deadly force:

> an imminent threat of serious physical harm to an officer is not sufficient to justify the employment of deadly force seconds after the threat is eliminated if a reasonable officer would have recognized when the force was employed that the threat no longer existed.

*Id.* at 482. The court went on to find the defendant officers were entitled to qualified immunity because the law was not clear at the time of the shooting.

The standard adopted by the Fourth Circuit in 2005 in *Waterman*, would apply to the subject use of force in 2016. Unlike in *Waterman,* Plaintiff was never a threat to police officers. While Waterman had tried to run officers off the road and reached down under his seat, Plaintiff was just sitting in the passenger seat of the Honda when he was approached by Defendant Cooper. Plaintiff did not try to strike Defendant Cooper with his car and did not reach down under his seat. Rather, Plaintiff raised his hand to Defendant Cooper and steered away from

Defendant Cooper. (Exhibit C, 17:57 to 18:09). Notably, at the time that shots were fired, Defendant Cooper was able to easily view both of Plaintiff hands on the steering wheel.

Unlike with the initial shots in *Waterman,* Defendant Cooper was not a second away from possibly being hit by Plaintiff when he opened fire. Plaintiff's vehicle was steered away from Defendant Cooper when he began to pull forward. Further, unlike in *Waterman,* Defendant Cooper was not in a fixed position when he began to fire at Plaintiff but was actually trying to position himself in front of Plaintiff. (Exhibit C, 17:57 to 18:09). Therefore, any threat of harm to Defendant Cooper was of his own making.

The Report finds that Officer Cooper's shots should all be considered together because they happened within seconds. Applying *Waterman,* the shot that struck Plaintiff "through the driver's side window," was unconstitutional. Defendant Cooper was beside the Honda when he shot Plaintiff. (Exhibit C, 18:04 to 18:08). This relative position of Defendant Cooper to the Plaintiff's vehicle clearly indicates no justification for use of deadly force because there was no threat of anyone being run over. There was no way for the Honda to have hit Defendant Cooper when Defendant Cooper fired the shots from the driver's side of the Honda through the driver's side window and door. Even taking Defendant Cooper's account as accurate, any reasonably perceived threat to Defendant Cooper had been absolutely eliminated by the time he shot through the driver's side door and window. Therefore, even if Defendant Cooper could prove that at some point there was an imminent threat of serious bodily harm, this threat was eliminated before Defendant Cooper fired through the driver's side door and window injuring Plaintiff and the shot that injured Plaintiff was unconstitutional.

The Report separates the shots when describing them:

> Officer Cooper . . . began firing through the driver's side of the car's front windshield at Gallmon as the Honda moved forward. While he

> was shooting, the car began moving past Officer Cooper to his left … Officer Cooper stepped to his left, toward the Honda, as he continued firing at Gallmon at close range. Officer Gallmon then stepped backwards to fire the remaining shots as he rotated to the left, continuing to shoot at the driver's side of the moving vehicle as it proceeded past him.

(Report, p. 3). Applying *Waterman* to these findings of fact, the shot that injured Plaintiff was unconstitutional.

### 3. The Report fails to properly address Officer Cooper's actions immediately before he began shooting Plaintiff.

The Report states "Gallmon's argument that Officer Cooper placed himself in danger by stepping in front of the Honda is unavailing." (p. 11). In so holding, the Report misapplies the holdings of three cases. These cases involve actions by officers that are remote in time and had ended at the time of shooting rather than the movement of Officer Cooper that continued up until and during the shooting. These cases are each discussed below.

In *Elliott v. Leavitt,* 99 F.3d 640 (4th Cir. 1996), officers stopped Elliott for driving while intoxicated. Elliott was placed under arrest. The officers searched Elliott, handcuffed him with his arms behind his back and seat belted him in the back seat of the patrol car. While the officers were outside of the car, Elliott managed to release the seatbelt and retrieve a handgun that the officers did not discover during their search. Elliott pointed the gun at the officers with his finger on the trigger. When the officers saw Elliott pointing the gun at them they ordered Elliott to drop the gun. When he did not respond, the officers opened fire killing Elliott. The Fourth Circuit Court of Appeals found summary judgment should be entered in favor of the officers' "use of deadly force was proper under the circumstances." (*Id.*).

Elliott argued the officers' actions violated his Fourth Amendment rights because they "searched Elliott only cursorily before placing him in the car." (*Id.* at 643). While it is not

completely clear from the opinion, presumably Elliott's argument was that had Elliott been properly searched his gun would have been taken from him and he would not have been able to point it at the officers with his finger on the trigger and, therefore, would not have had the opportunity to threaten the officers with his gun. Had he not been able to threaten the officers with his gun, the officers would have had no reason to shoot him. The Court found that even assuming the search was insufficient the search was "irrelevant to the excessive force inquiry." (*Id.* at 643).

In *Drewitt v. Pratt,* 999 F.2d 774 (4th Cir. 1993), Drewitt was driving a vehicle in an erratic matter, at night, with his headlights off. Officer Pratt, while off duty, witnessed Drewitt collide with a parked car and attempt to pull away. Officer Pratt ran toward the vehicle approaching from the direction the vehicle was facing. Officer Pratt screamed for Drewitt to stop. Drewitt stopped the vehicle. Officer Pratt was ahead of Drewitt's vehicle and on the passenger and attempted to cross in front of the vehicle to the driver's side. While he was crossing in front of the vehicle, Drewitt turned on his headlights and "sped forward towards" Pratt. Drewitt struck Pratt with his vehicle and rolled him onto the windshield. While on the windshield, Officer Pratt fired a shot into the vehicle. He then fell off the hood and accidentally discharged his gun again. Both shots struck Drewitt. *Id.* at 776.

Drewitt filed an excessive force claim against Officer Pratt. In opposition to Pratt's summary judgment motion, Drewitt argued material issues of fact existed as to whether Officer Pratt:

> approached Drewitt after he crossed Drewitt's path and was on Drewitt's driver side, about fifteen feet away . . . or whether Pratt approached Drewitt from Drewitt's passenger side and was six feet away in front of the car when it moved towards him.

*Id.* at 777.  Drewitt argued Pratt's position was relevant to determine whether Pratt could have jumped out of the way of Drewitt's "rapidly accelerating vehicle." *Id.* at 778.  The district court rejected Drewitt's argument holding "Those actions are not material to Officer Pratt's subsequent decision to shoot the plaintiff in light of the severe threat of physical harm to himself after being thrown on the hood of Plaintiff's vehicle. *Id.*  The Fourth Circuit affirmed the district court but also noted "Officer Pratt's exact location in connection to Drewitt's vehicle at the time it sped forward is relevant" to whether he posed a threat of death or severe bodily injury.

Lastly, in *Greenidge v. Ruffin,* 927 F.2d 789 (4th Cir. 1991), another excessive force claim, Officer Ruffin approached a parked vehicle that she witnessed a suspected prostitute enter a short time earlier in the evening.  As she approached, she witnessed the two occupants of the vehicle engaged in a sexual act.  She opened the door to the vehicle, identified herself as a police officer and ordered the two occupants to place their hands in view.  When the occupants did not comply, Ruffin pointed her drawn revolver into the vehicle and repeated her order.  One of the occupants, Greenidge reached for a "long cylindrical object" behind a car seat.  Believing Greenidge was reaching for a gun, Ruffin shot Greenidge.  It was later discovered Greenidge was reaching for a night stick. *Id.* at 790.

On appeal from a verdict in favor of Ruffin, Greenidge argued the district court erred in excluding evidence that Ruffin violated proper police procedure in not employing proper backup and not using a flashlight.  The Fourth Circuit held that the "officer's 'liability [must] be determined exclusively upon an examination and weighing of information [the officers] possessed *immediately prior to and at the very moment [they] fired the fatal shot[s].*'" *Id.* "Events which occurred before Officer Ruffin opened the car door and identified herself to the passengers [were] not probative of the reasonableness of Ruffin's decision to fire the shot." *Id.* at

792. Therefore, the district court did not abuse its discretion in excluding "evidence of the officer's actions leading up to *the time immediately prior to the shooting*." *Id.* at 792.

Unlike the above cases, the actions of Officer Cooper in attempting to place himself in front of the Honda took place "immediately prior to the shooting" and as he began shooting. *Id.* Officer Cooper steadily moved toward the path of the vehicle "immediately prior to the shooting." (Exhibit C, 17:57 to 18:09). As he was firing his first shot he was actually leaning in toward the vehicle to get a better shot at the driver. (Exhibit C, 18:04 to 18:08). Officer Cooper's active movements are relevant to the Magistrate's finding that Officer Cooper was in such a close proximity to the Honda that he could have perceived he was in danger of serious injury or death and that he could have perceived the Honda could have changed direction and hit him. Therefore, it is error to disregard Officer Cooper's movements immediately before and at the moment he shot.

**4.     The Report's reliance on Brown v. Elliott, 876 F.3d 637 (2017) is misplaced.**

In Brown, Melvin Lawhorn's estate brought an excessive force claim against Officer Elliott and others over the shooting death of Lawhorn. The undisputed or unappealed facts established that during a traffic stop, Lawhorn was in the passenger seat of a truck the officers pulled over. As the officers approached the truck, which was running, Lawhorn attempted to jump toward the driver's seat and put his foot on top of the driver's foot in an effort to mash the gas pedal while at the same time trying to shift the truck into drive. The officers shouted for Lawhorn to "freeze" and "don't move" and he did not comply. Officer Elliott leaned into the vehicle to grab Lawhorn. Lawhorn shifted the vehicle to drive and moved the vehicle forward with Officer Elliott "'substantially leaning inside the truck'". Id. at 643. The issue before the court was "whether any controlling authority clearly established that an officer must abstain from

employing deadly force when a suspect puts a vehicle in motion while the officer is leaning into it." Id.

In distinguishing between the actions of Officer Elliott and the cases of Krein and Waterman, the court held:

> "were we confronted with similar circumstances here, we would conclude Deputy Elliott violated clearly established law. But those are not the circumstances of this case. When Deputy Elliott fired his gun, he was leaning into the window of a moving truck, not standing off to the side as the truck passed him without veering in his direction."

Id. at 644. As is presented in the scenario that Officer Cooper was confronted with here, he was not only leaning in towards the Honda, but actually moving towards and in concert with the vehicle so as to position himself in a more opportune location for shooting the Plaintiff. Based on the findings of *Brown*, these actions by Officer Cooper were unequivocally illegal and such illegality was very apparent based on clearly established law.

5. **The Report misapplies *Krein* and *Waterman* in affirming and recognizing the unconstitutionality of Defendant Cooper's actions.**

*Krein v. Price* is an unpublished opinion of the Fourth Circuit Court of Appeals. (FRAP 32.1). In *Krein*, officers Price and Snyder attempted to block in Krein's truck at a gas station. Krein was wanted for misdemeanor domestic violence. When the officers arrived at the gas station, Krein was pulling forward in his truck. Officer Price positioned his cruiser in front of Krein's truck with the passenger side door closest to Krein's truck in an attempt to block Krein from escaping the scene. Price and Snyder exited the cruiser and left the passenger door open. Krein backed up, hitting a fuel tank and then pulled forward and struck the passenger door of the cruiser. Price eventually moved toward the front of Krein's truck and positioned himself between the front of the truck and the cruiser.

Krein drove forward towards Price and Price fired at Krein's truck either striking the truck's grill or missing the truck completely. Krein then turned his vehicle and accelerated towards Snyder. Snyder got out of the way. As Krein pulled forward, Price fired a second shot through the passenger-side window striking Krein in the head and killing him.

Price claimed that he was "trapped" without "anywhere to go." A witness testified that Price "fired shots when [Krein] was pulling around them. The court found there was "sufficient evidence in the record for a reasonable factfinder to conclude that Price's second shot- fired from the side of Krein's vehicle- was excessive" because "[Krein] no longer posed a serious threat to the troopers at the time Price fired his second shot." Id. Essentially, the Court found that "a reasonable officer would have realized that deadly force was not necessary to protect himself or others when he was no longer in the direction of [the] vehicle." Id. at 189.

In the instant case a reasonable factfinder could make the same determination. After the shooting, Defendant Cooper left the scene to chase Plaintiff. (Exhibit C, 17:57 to 18:09). Defendant Cooper was ordered back to the scene and parked his SUV in as near a position as possible to where it was during the shooting. Id. Defendant Cooper claims that he "had nowhere to move because there was a parked car to my left and my patrol car to my right and behind me." The video, photos taken at the scene and the testimony of Plaintiff contradict Defendant Cooper's account.

The video shows that Defendant Cooper never tried to move away from the path of the Honda. Instead, Defendant Cooper steadily advanced toward the path of the Honda. The video shows that there was sufficient room between Defendant Cooper and his SUV for Defendant Cooper to have moved away from the Honda. In fact, Defendant Cooper had already passed in front of the SUV twice without obstruction. Further, photos of the crime scene show that there

was more than enough room between the "vehicle to the left" and the SUV so that Defendant Cooper was not trapped. Plaintiff's testimony confirms that Defendant Cooper was not trapped but actively moved himself towards the path of the SUV.

Further, as in *Krein*, Defendant Cooper shot Plaintiff through a side window, not from the front of the Honda. Therefore, an imminent threat of physical harm did not exist at the time Defendant shot Plaintiff and the shot was unconstitutional.

The right at issue here is the right to be "free from unreasonable seizures, a right which includes seizures accomplished by excessive force." *Waterman*, 393 F.3d at 475. In *Waterman*, the Court explained that officers exceeded constitutional bounds by continuing to fire after the vehicle passed them, at which point the officers knew or should have known that the immediate threat of harm had passed. *Id*. at 482. This right to be free from unreasonable seizures accomplished by excessive force is clearly established. See *Estate of Rodgers ex. rel. Rodgers v. Smith*, 188 Fed.Appx. 175, 183-84 (4th Cir. 2006) (determining the law established in *Waterman* was clear). In *Krein*, the court summarizes the *Waterman* principles logically:

> Based on [this] principle, we concluded that "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." [*Waterman*, 393 F.3d at 481.] We distinguished when Waterman's car was passing the officers—finding that they reasonably feared for their safety at that point—from when Waterman's car had passed them—finding that the danger had also passed. *Id*. at 482. The shots fired at Waterman after he had passed the officers in his car constituted excessive force. *Id*. At that point, the officers and bystanders were not endangered by Waterman's vehicle. *Id*.

*Krein*, 596 Fed.Appx. at 190. This same logic is equally applicable to the present case. As is clearly visible in the video, Defendant Cooper was pursuing the vehicle on foot and at all times he was free to move in almost any direction. Ultimately, Defendant Cooper moved towards the

path of the vehicle but was never actually in path of the vehicle. After putting both hands in plain view, Plaintiff proceeded to slowly drive around Defendant Cooper, thus alleviating any sense or threat of danger that could have been perceived by Defendant Cooper immediately. Defendant Cooper could not reasonably or even logically have been in danger if Plaintiff was passing him; however, Defendant Cooper proceeded to discharge his firearm into the driver's side of Plaintiff's vehicle. Defendant Cooper discharged his firearm seven times into the side of Plaintiff's vehicle striking Plaintiff on the left side. Defendant Cooper's use of deadly force without any endangerment of himself or others constitutes excessive force.

**6.     The Report misrelies on precedents for its determination of immunity under the SCTCA.**

Plaintiff objects specifically to the Court's reliance on *Jones v. Lott*, 665 S.E.2d 642, 644 (S.C. Ct. App. 2008) and *Huggins v. Metts*, 640 S.E.2d 465, 467 (S.C. Ct. App.2006).

First, *Jones* offers no precedential value in this case. In *Jones*, the Sheriff's Department claimed immunity based on S.C. Code Section 15-78-60(6). The trial judge granted a directed verdict upon finding that the Sheriff was immune under Section 15-78-60(6). Jones attempted to argue on appeal that the trial judge had improperly interpreted and improperly based his finding of immunity on Section 15-78-60(6). However, the Court of Appeals held that Jones had failed to preserve this argument for appellate review. Therefore, the Court of Appeals held that the trial judge's ruling of immunity pursuant to Subsection 6 was the law of the case, and no further appellate analysis or review occurred.

In *Huggins*, the Court of Appeals found immunity was applicable to the "the methods which they choose to provide police protection." *Huggins*, 640 S.E.2d at 467. Specifically, the Court notes that the claim was regarding the "preparation and events leading up to the time immediately preceding the shooting." *Id*. However, the Court of Appeals made no distinction

between the formulation of policy and the implementation of policy for the provision of police protection. This is a key distinction that was not considered or apparent to the *Huggins* Court analysis. The Court merely held that the government is immune from suit for a loss related to policy decision of which methodology to employ for the provision of police protection; however, the Court did not consider, nor offer any guidance on whether the government may be liable for the failure of adhering to such methodology. Accordingly, the relevant, plain language of the statute unequivocally reads "a governmental entity is not liable for . . . the failure to provide or the method of police . . . protection." S.C. Code Section 15-78-60(6) (*Wells v. City of Lynchburg*, 501 S.E.2d 746, 750 (S.C. Ct. App. 1998) (scrivener's error corrected)). The words used must be given their plain and ordinary meaning without resorting to subtle or forced construction to limit or expand the statute's operation." "The cardinal rule of statutory construction is to ascertain and give effect to the intent of the legislature." *Sloan Constr. Co. v. Southco Grassing, Inc.*, 395 S.C. 164, 170, 717 S.E.2d 603, 606 (2011). "If a statute's language is plain, unambiguous, and conveys a clear meaning, 'the rules of statutory interpretation are not needed and the court has no right to impose another meaning.'" *Id*.; *Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 582 (2000)). When interpreting a statute, the court "must read the language in a sense that harmonizes with its subject matter and accords with its general purpose." The word "Method" clearly implicates the orderly and deliberate process by which something is intended to be accomplished. The word "Method" does not incorporate the execution, administration, or provision of that process. By analogy, a method is the plan, not the process itself. Plaintiff argues that in this instance, The Defendant Forest Acres Police Department failed to adhere to its own methods and was negligent in doing so. Accordingly, such negligence is not immune from suit under the SCTCA.

Furthermore, this matter is distinguished from Huggins in another regard. Notably, Defendant Forest Acres Police Department was responding to a noise violation complaint. There was no perceived threat of harm or sufficient danger to provide "police protection." See *Boschele v. Rainwater*, 2016 WL 528836, *5 (D.S.C. February 10, 2016) (J. Hendricks) (immunity for loss resulting from the methods of providing police protection, cannot provide immunity if there was not sufficient danger to require police protection). Accordingly, S.C. Code Section 15-78-60(6) is not applicable and cannot provide immunity to Defendant Forest Acres Police Department.

## CONCLUSION

For the reason stated above and in the reasons stated in Plaintiff's Responses in Opposition to Defendants' Motion for Summary Judgment. The Court should not accept the Report and Recommendation and should deny Defendants' Motion for Summary Judgment.

                          PETERS, MURDAUGH, PARKER, ELTZROTH & DETRICK, P.A.

By:  *s/ Grahame E. Holmes*
Grahame E. Holmes
Fed ID# 09275
Neil E. Alger
Fed ID# 11903
123 Walter Street
Post Office Box 1164
Walterboro, SC 29488
(843) 549-9544

ATTORNEYS FOR PLAINTIFFS

May 3, 2018
Walterboro, South Carolina